## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
|  |  | PRISONER |
| MICHAEL HARTSOCK | : | CIVIL NO. 3:03CV735 (JCH)(HBF) |
| v. | : |  |
| JOHN ARMSTRONG, ET AL. | : | DECEMBER 22, 2004 |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

**I.**    **INTRODUCTION**

This is a civil rights action in which the plaintiff, Michael Hartsock, an inmate incarcerated at the Cheshire Correctional Institution ("Cheshire C.I.") seeks money damages against the defendants for allegedly refusing to provide him with Hepatitis C therapy. The defendants are John Armstrong, Larry Myers, Brian Murphy, Hector Rodriguez, Jack Tokarz, Dr. Edward Blanchette, Patricia Ottolini, Dr. Kevin Dieckhaus, Dr. Jack Maleh, Patricia Pace, Pamela Shea and Patricia Wollenhaupt. The plaintiff alleges that the defendants' denial of treatment for Hepatitis C constitutes deliberate indifference to his serious medical needs in violation of the Eighth and Fourteenth Amendments to the United States Constitution. He further alleges that the failure to provide him with Hepatitis C therapy violated Conn. Gen. Stat. § 19a-103.[1]

---

[1] Conn. Gen. Stat. § 19a-103 provides:

> Any person confined or imprisoned in the Connecticut Correctional Institution, Somers, or in a community correctional center or in any other institution for a period of ten days or longer may be examined for any communicable disease, and, if found infected with any such disease, he shall be treated during the term of his confinement and, if not cured at the date of his discharge, the local director of health shall be notified. The person in charge of each such institution shall provide for such examination and necessary treatment of all such persons admitted thereto. The Department of Public Health may make

The facts which are pertinent to this lawsuit are as set forth in the affidavits, exhibits and Local Rule 56(a)1 Statement filed herewith.  These documents show the lack of personal involvement in the plaintiff's case on the part of some of the defendants and the appropriateness of the care provided to the plaintiff by the named medical defendants which was in accordance with applicable guidelines, protocols and standards of care.

## II.    <u>SUMMARY JUDGMENT</u>

Summary Judgment, "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. § 56(c).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). <u>See</u> <u>also</u>, <u>Quarles v. General Motors Corp.</u>, 758 F.2d 839, 840 (2d Cir. 1985) (per curiam).  A party may not rely "on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."  <u>Knight v. U.S. Fire Ins. Co.</u>, 804 F.2d 9, 12 (2d Cir. 1986).  The party opposing a motion for summary judgment "may not rest upon the mere allegation or denials of his pleadings, but … must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. § 56(e).

In discussing the history and propriety of summary judgment motions, the Supreme Court noted:

> Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every

such regulations or orders as, in its judgment, are necessary to carry out the provisions of this section.

action." Fed. Rule Civ. Proc. 1 … Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986).

To successfully oppose a motion for summary judgment, the plaintiff must present "significant probative evidence to create a genuine issue of material fact." Soto v. Meachum, Civ. No. B-90-270 (WWE), 1991 WL 218481, at *6 (D. Conn. Aug. 28, 1991). "[T]he mere verification by affidavit of one's own conclusory allegations is not sufficient to oppose a motion for summary judgment." Greene v. Georgia Pardons & Parole Bd., 807 F. Supp. 748, 751 n.5 (N.D. Ga. 1992) (citing Fullman v. Graddick, 739 F.2d 553, 557 (11th Cir. 1984)). An affidavit in which the plaintiff merely restates the conclusory allegations of the complaint and denies the truth of the affidavits filed by the defendants is insufficient to create an issue of fact that would make summary judgment inappropriate. Donnelly v. Guion, 467 F.2d 290, 293 (2d Cir. 1972). As one court has stated, to permit such an affidavit to form the basis of denying the defendants' motion for summary judgment "would amount to permitting the plaintiff to keep [his] case in court merely by swearing that [he] has a case." Zenith Vinyl Fabrics Corp. v. Ford Motor Co., 357 F. Supp. 133,139 (E.D. Mich. 1973). The record in this case, even when considered in a light most favorable to the plaintiff, fully supports the granting of summary judgment in favor or the defendants.

III.    **ARGUMENT**

    A.    **To The Extent That This Action May Be Deemed To Include A Claim For Money Damages Against The Defendants In Their Official Capacity, Such Claims Are Barred By The Eleventh Amendment To The United States Constitution.**

    "[A]bsent waiver by the State or valid congressional override, the Eleventh Amendment bars a damage action against a State in federal court." Kentucky v. Graham, 473 U.S. 159, 169, 105 S. Ct. 3099, 3107 (1985). In Will v. Michigan Dept. of State Police, 491 U.S. 58, 109 S. Ct. 2304, 2309 (1989), the Supreme Court summarized the scope of Eleventh Amendment immunity as follows:

> Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties. The Eleventh Amendment bars such suits unless the State has waived its immunity, or unless Congress has exercised its undoubted power under § 5 of the Fourteenth Amendment to override that immunity. That Congress, in passing § 1983, had no intention to disturb the State's Eleventh Amendment immunity and so alter the Federal-State balance in that respect was made clear in our decision in Quern.

(Citation omitted). Eleventh Amendment immunity is extended to suits against state officials in their official capacity since they represent only another way of pleading an action against the state. Hafer v. Melo, 502 U.S. 21, 112 S. Ct. 358, 361 (1991); Kentucky v. Graham, supra, 105 S. Ct. at 3105.

    In this case, the individual defendants are named in their official and individual capacity. By way of relief, the plaintiff seeks money damages. Therefore, to the extent that this suit seeks money damages from the individual defendants in their official capacity, it is barred by the Eleventh Amendment to the United States Constitution.

B.    **The Court Lacks Personal Jurisdiction Over Defendant Jack Maleh, M.D., In That He Was Not Served With The Summons And Complaint In This Case**

Subsection (e) of Rule 4 of the Federal Rules of Civil Procedure provides as follows:

Unless otherwise provided by federal law, service upon an individual from whom a waiver has not been obtained and filed, other than an infant or an incompetent person, may be effected in any judicial district of the United States:

(1) pursuant to the law of the state in which the district court is located, or in which service is effected, for the service of a summons upon the defendant in an action brought in the courts of general jurisdiction of the State; or

(2) by delivering a copy of the summons and of the complaint to the individual personally or by leaving copies thereof at the individual's dwelling house or usual place of abode with some person of suitable age and discretion then residing therein or by delivering a copy of the summons and of the complaint to an agent authorized by appointment or by law to receive service of process.

Id. With reference to Rule 4, subsection(c)(2)(C)(i) of Conn. Gen. Stat. § 52-57 provides, in pertinent part, that "process in any civil action shall be served by leaving a true and attested copy of it, including the declaration or complaint, with the defendant, or at his usual place of abode, in this state." Under Connecticut law, process which is merely handed to an agent of an individual defendant at his place of business is void. See United States Guarantee Company v. Giarelli, 14 Conn. Sup. 400 (1947). Absent proper service of process, the court to which such process is returnable lacks jurisdiction over the person of the defendant. Hyde v. Richard, 145 Conn. 24, 138 A.2d 527 (1958); Cugno v. Kaelin, 138 Conn. 341, 84 A.2d 576 (1951). Finally, subsection (m) of Rule 4, F.R.C.P. provides that

[i]f service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time, provided that if the plaintiff shows good cause for the failure, the court shall extend the time for service for an appropriate period. This subdivision does not apply to service in a foreign country pursuant to subdivision (f) or (j)(1).

Id.

Rule 4 deals with service of original process, which is the means by which the court secures jurisdiction over the defendant's person. Without jurisdiction over the person, the court cannot render a valid judgment against him. Such a judgment, absent personal jurisdiction, violates due process. See, generally, Shaffer v. Heitner, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977); McDonald v. Mabee, 243 U.S. 90, 37 S.Ct. 343, 61 L.Ed. 608 (1917); Pennoyer v. Neff, 95 U.S. 714, 24 L.Ed. 565 (1877).

> Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied. "[S]ervice of summons is the procedure by which a court having venue and jurisdiction of the subject matter of the suit asserts jurisdiction over the person of the party served." *Mississippi Publishing Corp. v. Murphree*, 326 U.S. 438, 444-45, 66 S.Ct. 242, 245-46, 90 L.Ed. 185 (1946). Thus, before a court may exercise personal jurisdiction over a defendant, there must be more than notice to the defendant and a constitutionally sufficient relationship between the defendant and the forum. There also must be a basis for the defendant's amenability to service of summons. Absent consent, this means there must be authorization for service of summons on the defendant.

Omni Capitol Intern v. Rudolph Wolff & Co., Ltd., 484 U.S. 97, 103, 108 S.Ct. 404, 409, 98 L.Ed.2d 415 (1987).

Dr. Jack Maleh died on August 5, 2004, before receiving any notice as to this lawsuit. Undersigned counsel has not appeared for Dr. Maleh in his individual capacity in that I have no permission from him to do so. While the Complaint in this case fails to state a cause of action against Dr. Maleh and the evidence shows that his ordering of blood tests for the plaintiff on May 14, 2002 was appropriate and within the standard of care, it is submitted that the Court lacks personal jurisdiction over defendant Dr. Maleh.

C.    **The Claims Against Larry Myers And Patricia Wollenhaupt Are Barred By The Statute Of Limitations**

In Connecticut, claims brought under 42 U.S.C. § 1983 are governed by the three year statute of limitations period set forth in Conn. Gen. Stat. § 52-577.[2] Lounsbury v. Jeffries, 25 F.3d, 131, 134 (2d Cir. 1994).

The plaintiff was incarcerated at the Northern Correctional Institution ("NCI") from March 4, 1999 until April 5, 2000 when he was transferred to the MacDougall-Walker Correctional Institution ("M-WCI"). (Local Rule 56(a)1 Statement, paras. 12, 22; Exhibit A to Blanchette Affidavit). He has not been housed at NCI since April 5, 2000. (Exhibit A to Blanchette Affidavit). Larry Myers was the Warden at NCI during the time that the plaintiff was at that facility. He is apparently being sued because he did not ensure that the plaintiff received Hepatitis C treatment at NCI.

Patricia Wollenhaupt was a Registered Nurse at NCI from August, 1999 through April 5, 2000. The plaintiff claims that Ms. Wollenhaupt told him in November, 1999, that he did not look like a candidate to be treated for the Hepatitis C virus. (Local Rule 56(a)1 Statement, paras. 10, 18 and 22).

The alleged actions or inactions of defendants Myers and Wollenhaupt occurred prior to the plaintiff's transfer to M-WCI on April 5, 2000. The plaintiff claims that they did not treat his Hepatitis C despite his requests for treatment. Assuming arguendo that the plaintiff's allegations are true, the plaintiff's cause of action against defendant Myers and defendant Wollenhaupt would have accrued prior to April 5, 2000.

---

[2] Section 52-577 provides:

> No action founded upon tort shall be brought but within three years from the date of the action or omission complained of.

The plaintiff's original Complaint in this case was not filed until April 24, 2003.  See pages 1 and 2 of docket sheet attached hereto as Attachment A.  Defendant Wollenhaupt was not named in the original Complaint and did not receive a copy of the Amended Complaint until August, 2004.  Even if Ms. Wollenhaupt had been named in the original Complaint, the claims as to her and Larry Myers would still be barred by the statute of limitations.

Since the Complaint in this action was not filed until more than three years after the plaintiff left NCI, the statute of limitations bars the action as to Larry Myers and Patricia Wollenhaupt.

**D.    The Defendants Were Not Deliberately Indifferent To The Plaintiff's Medical Needs And Did Not Violate His Rights Under The Eighth Amendment Of The United States Constitution**

To establish an unconstitutional denial of medical care, an inmate must prove "deliberate indifference to [his] serious medical needs."  Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 291 (1976).  Mere negligence will not support a Section 1983 claim.  The conduct complained of must "shock the conscience" or constitute a "barbarous act."  McCloud v. Delaney, 677 F. Supp. 203, 232 (S.D.N.Y. 1988) (citing United States ex rel. Hyde v. McGinnis, 429 F.2d 864 (2d Cir. 1970).  A treating physician will be liable under the Eighth Amendment only if his conduct is "repugnant to the conscience of mankind."  Tomarkin v. Ward, 534 F. Supp. 1224, 1230 (S.D.N.Y. 1982) (quoting Estelle, 429 U.S. at 105-06).

Inmates do not have a constitutional right to the treatment of their choice.  See Dean v. Coughlin, 804 F.2d 207, 215 (2d Cir. 1986).  Thus, mere disagreement with prison officials about what constitutes appropriate medical care does not state a claim cognizable under the Eighth Amendment.  Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir. 1998).

There are both subjective and objective components to the deliberate indifference standard.  Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994).  The alleged deprivation must

be "sufficiently serious" in objective terms. Wilson v. Seiter, 501 U.S. 294, 298 (1991). The term "serious medical need" contemplates "a condition of urgency, one that may produce death, degeneration, or extreme pain." Hathaway, supra, 37 F.3d at 66 (quoting Nance v. Kelley, 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, J., dissenting)). Factors which are relevant in determining the seriousness of a medical need include "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of a chronic and substantial pain." Chance v. Armstrong, supra, 143 F.3d at 702 (citation omitted). Also, where the denial of treatment causes a plaintiff to suffer a permanent loss or life-long handicap, the medical need is considered serious. See Harrison v. Barkley, 219 F.3d 136 (2d Cir. 2000).

The plaintiff in this case has recently concluded his Hepatitis C therapy. His claim is essentially that the defendants were deliberately indifferent in delaying treatment until November, 2003. The inquiry into the issue of "serious medical need" is fact-specific and "must be tailored to the specific circumstances of each case." Smith v. Carpenter, 316 F.3d 178, 185 (2d Cir. 2003). While the defendants in this case would not dispute the fact that Hepatitis C is a serious medical condition, "[w]hen the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious,' to support an Eighth Amendment claim." Id. at 185 (citation omitted). In analyzing the severity of the alleged denial of medical care, "[t]he absence of adverse medical effects or demonstrable physical injury is one such factor that may be used to gauge the severity of the medical need at issue." Id. at 187.

In addition to demonstrating a serious medical need to satisfy the objective component of the deliberate indifference standard, an inmate also must present evidence that, subjectively, the charged prison official acted with "a sufficiently culpable state of mind." Chance, supra, 143 F.3d at 702. "An official  acts with the requisite deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. (quoting Farmer v. Brennan, 511 U.S. 825, 837 1994)).  Prison officials who are aware of serious risks to an inmate's health may not be found liable "if they responded reasonably to the risk, even if harm ultimately is not averted." Farmer v. Brennan, supra, 511 U.S. at 844, 114 S. Ct. at 1982-83.

The courts have consistently held that a denial of Hepatitis C medication therapy based upon a physician's judgment as to the patient's eligibility for such treatment and/or the advisability of such treatment does not constitute deliberate indifference.  In a case somewhat similar to the present case, Judge Squatrito held that correctional physicians appropriately relied on National Institute of Health guidelines which did not recommend Interferon treatment for patients unless they demonstrated elevated liver enzymes (over 100) for a period longer than four to six months.   Since the inmate did not meet the criteria for Interferon treatment, the correctional physicians were not deliberately indifferent to a serious medical need simply because they refused to prescribe the Interferon.  Cardinales v. Bianchi, et al., No. 3:98CV515 (DJS)(TPS), slip. op. at 11-13 (D. Conn. March 26, 2001) (attached as Attachment B).

In holding that denial of Hepatitis C therapy was not deliberate indifference, a district judge for the Southern District of New York stated,

> In essence, rather than knowing of and disregarding an excessive risk to
> Plaintiff's health and safety in refusing to treat him with Interferon and Ribavirin,

10

the physicians acted pursuant to their medical judgment (as based on the Hepatitis C Guideline and current medical literature on the relevant subject matter) to protect Plaintiff's health. Such conduct does not constitute deliberate indifference. . . . .     Moreover, although Plaintiff disagrees with the physicians' treatment decisions as well as their decompensated cirrhosis diagnosis and claims that he is entitled to consult with a specialist regarding a different diagnosis and treatment plan, such disagreements and allegations do not amount to Eighth Amendment violations.

McKenna v. Wright, 2002 U.S. Dist. Lexis 3489 at *20-22 (S.D.N.Y. 2002) (attached as

Attachment C).

Similarly, summary judgment was granted in Gresh v. Berks Co, 2002 U.S. Dist. Lexis

13347 (Ed. Pa. 2002) (attached as Attachment D).

. . . . Gresh was not a suitable candidate for the drug combination therapy.  His liver function, while not normal, was not sufficiently impaired to warrant the therapy.  He had not been declared psychologically fit, a failure especially relevant in light of this previous attempted suicide.

Id. at *17.

Also, a New Jersey Federal District Judge granted summary judgment holding:

Plaintiff further contends that the denial of his request for treatment of his hepatitis C with interferon/ribavirin combination therapy is evidence of deliberate indifference.  The record, however, does not contain compelling evidence that interferon/ribavirin is the appropriate treatment for Plaintiff at this time. . . .  the regulations suggest that prisoners with histories of depression and/or psychiatric illness should not take interferon/ribavirin, because such treatment could cause severe psychiatric problems.  Plaintiff's present course of treatment, in which his liver functions and liver enzymes are monitored regularly, is consistent with standards set forth by the Bureau of Prisons.  The medical evidence does not demonstrate that Plaintiff's hepatitis C has reached the point were an intensive program of drug therapy, such as interferon/ribavirin, would be preferred over Plaintiff's present course of treatment.  Indeed, Dr. John noted in his report that starting Plaintiff on a drug therapy program might even aggravate Plaintiff's symptoms and damage his liver. . . .    Even were this Court to find that interferon/ribavirin treatment is appropriate in Plaintiff's case, Plaintiff still has not met his burden of showing the denial of such treatment constitutes a violation of the Eighth Amendment. . . . .   While the standard protocol for treating hepatitis C may be evolving, nothing in the record suggests that interferon/ribavirin is necessary for proper treatment and there is no evidence that the course of treatment adopted by Defendants deviates from the standard medical practice.

Christy v. Robinson, 216 F. Supp. 2d 398, 415-16 (D. N.J. 2002), see also, McQueen v. Revell, 2001 U.S. Dist. Lexis 17155 (N.D. Texas 2001) ("If plaintiff's physicians responsible for treatment of his Hepatitis C consider it inadvisable to administer Interferon/Ribaviron [sic] treatment while plaintiff is taking certain psychiatric medication, the failure to administer Interferon/Ribaviron [sic] treatment, in the face of plaintiff's refusal to consent to discontinuance of his psychiatric medication, does not constitute deliberate indifference.") (attached as Attachment E).

When the actions of the defendants are measured against these legal standards, it is clear that the defendants in the present case did not violate the plaintiff's rights under the Eighth Amendment and that summary judgment in their favor is appropriate.

There is no evidence in this case to satisfy the objective Eighth Amendment "serious medical need" standard.  The plaintiff did not meet the Hepatitis C treatment criteria in June, 2002.  (Local Rule 56(a)1 Statement, paras, 41, 42 and 44).  Except for a brief period during the latter part of 2003, the plaintiff's liver enzyme levels have remained very stable.  During the past year, his liver enzyme levels have been normal.  There is no evidence of any clinically significant progression of the plaintiff's Hepatitis C disease over the past few years.  Indeed, by waiting until the much improved form of Interferon became available, the plaintiff has been given the best possible chance of becoming a long-term responder to Hepatitis C therapy.  (Local Rule 56(a)1 Statement, paras. 57-58).

Even if we were to assume arguendo that the plaintiff had satisfied the "serious medical need" requirement, there is no evidence that the defendants were subjectively aware of an excessive risk to the plaintiff's health and safety and disregarded such a risk.

1.    <u>**Warden Larry Myers**</u>

The Complaint simply alleges that Larry Myers was the Warden at NCI.  There is no allegation that Warden Myers even knew the plaintiff.  A search of the correspondence files at the Warden's office at NCI did not reveal any communication from the plaintiff to Warden Myers relating to Hepatitis C or any other subject.  (Local Rule 56(a)1 Statement, para. 17).

Personal involvement in an alleged constitutional deprivation is a prerequisite to an award of damages under 42 U.S.C. § 1983.  <u>Merriwether v. Coughlin</u>, 879 F.2d 1037, 1048 (2d Cir. 1989); <u>Williams v. Smith</u>, 781 F.2d 319 (2d Cir. 1986); <u>Ayers v. Coughlin</u>, 780 F.2d 205 (2d Cir. 1985); <u>McKinnon v. Patterson</u>, 568 F.2d 930 (2d Cir. 1977); <u>cert</u>. <u>denied</u>, 434 U.S. 1087 (1978).  The doctrine of respondeat superior is not applicable to § 1983 cases.  <u>Monell v. New York City Dep't of Social Services</u>, 436 U.S. 658, 692-95 (1978).

A supervisory official who has not directly participated in the conduct complained of may be found personally involved in the deprivation of an inmate's right in other ways.  For example, he may have failed to remedy the wrong after the violation was brought to his attention through a report or appeal; created, or permitted to continue, the policy or custom pursuant to which the alleged violation occurred; or been grossly negligent in managing officials under his supervision who caused the unlawful incident.  <u>Wright v. Smith</u>, 21 F.3d 496, 501 (2d Cir. 1994) (<u>citing</u>, <u>Williams v. Smith</u>, 781 F.2d 319, 323-24 (2d Cir. 1986)).

The assessment, management and treatment of Hepatitis C is a complex undertaking usually requiring the expertise of an Infectious Disease Specialist.  Many patients do not meet the criteria for treatment for a variety of reasons.  Even if Warden Myers knew of the plaintiff's Hepatitis C, he would not have been able to make any decisions regarding the management and

treatment of the disease. (Local Rule 56(a)1 Statement, para. 60). There is no basis for a finding of deliberate indifference on the part of former Warden Myers.

### 2.    <u>Warden Brian Murphy</u>

The plaintiff was incarcerated at the MacDougall-Walker Correctional Institution ("M-WCI") from August 13, 2001 to March 7, 2002. (Local Rule 56(a)1 Statement, para. 30). Warden Brian Murphy does not recall having any conversations with the plaintiff regarding Hepatitis C when the plaintiff was at M-WCI. (Local Rule 56(a)1 Statement, para. 31). An extensive search of the correspondence files in the Warden's office at M-WCI has not revealed any communication from the plaintiff relating to Hepatitis C. (Local Rule 56(a)1 Statement, para. 32). Warden Murphy was not aware that the plaintiff had Hepatitis C until he was served with a copy of the Complaint in this case in August, 2003. (Local Rule 56(a)1 Statement, para. 33).

If the plaintiff had communicated with Warden Murphy regarding any concerns about his Hepatitis C, Warden Murphy would have communicated with the medical staff at M-WCI regarding those concerns. Warden Murphy is not a medical practitioner and he cannot make decisions as to when or if treatment for Hepatitis C may be appropriate in any given case. (Local Rule 56(a)1 Statement, para. 34). There is no basis for a finding of deliberate indifference on the part of former Warden Murphy.

### 3.    <u>Patricia Wollenhaupt</u>

The plaintiff alleges that on one occasion in November, 1999, Patricia Wollenhaupt, R.N., stated to him during a tour of NCI that he did not look like a candidate to be treated for the Hepatitis C virus. (Para. 22 of the Complaint). Ms. Wollenhaupt was on a leave of absence from work in November, 1999. (Local Rule 56(a)1 Statement, para. 21). She does not remember the

plaintiff or having any communication with him regarding Hepatitis C. If she had seen the plaintiff on any sort of formal visit to the medical unit, she would have made an entry in his medical chart. Ms. Wollenhaupt did not make any entries in the plaintiff's medical chart. (Local Rule 56(a)1 Statement, para. 19).

Only a physician can determine a patient's eligibility for Hepatitis C treatment. Ms. Wollenhaupt does not have the training or authority to make any treatment decisions regarding Hepatitis C. (Local Rule 56(a)1 Statement, para. 20).

Even if Ms. Wollenhaupt did tell the plaintiff on one of her tours of NCI that he did not look like a candidate for Hepatitis C treatment, it is certainly not a violation of an inmate's constitutional right to have a conversation with the inmate during a tour of the facility and tell the inmate that he looks healthy and does not appear to be in need of Hepatitis C treatment. The plaintiff did not meet the criteria for treatment in 2002. (Local Rule 56(a)1 Statement, paras. 41-42). One would hope that Ms. Wollenhaupt would be allowed to express an informal opinion to an inmate during a tour when she encounters many inmates without having to worry about being sued for her comment years later. The plaintiff was free to consult a physician at NCI regarding the subject of Hepatitis C treatment.

### 4. **Patricia Ottolini, R.N., Commissioner John Armstrong, Deputy Commissioner Jack Tokarz and Warden Hector Rodriguez**

On May 1, 2002, the plaintiff sent a notice to several officials including DOC Commissioner John Armstrong, Deputy Commissioner Jack Tokarz, DOC Health Services Program Director Patricia Ottolini and Warden Hector Rodriguez of the Cheshire C.I. (Local Rule 56(a)1 Statement, para. 36; Exhibit B to Ottolini Affidavit). Commissioner Armstrong asked Patricia Ottolini to investigate the plaintiff's Hepatitis C status and respond to his letter on behalf of the Commissioner, Deputy Commissioner Tokarz and Warden Rodriguez. (Local Rule

56(a)1 Statement, para. 37).   On May 22, 2002, Patricia Ottolini sent a letter to the plaintiff noting that Dr. Jack Maleh had ordered blood tests on May 14, 2002 to ascertain his current Hepatitis C status.  She also assured the plaintiff that the results of the tests would be reviewed to determine a proper course of treatment.   (Local Rule 56(a)1 Statement, para. 39).  Following Patricia Ottolini's response to the plaintiff on May 22, 2002, the Commissioner's office did not receive any further communication from the plaintiff.  (Local Rule 56(a)1 Statement, para. 40).

Defendants Armstrong, Tokarz, Ottolini and Rodriguez obviously did not ignore the plaintiff's request for evaluation and treatment of his Hepatitis C.  They responded by ensuring that the plaintiff's Hepatitis C status would be evaluated and monitored.   Thereafter, the plaintiff's Hepatitis C status was evaluated and monitored by Infectious Disease Specialists including Dr. Kevin Dieckhaus, Dr. James O'Halloran and the Hepatitis C Review Board ("Hep CURB").  (Local Rule 56(a)1 Statement, paras. 41-50).

Defendants Armstrong, Tokarz, Ottolini and Rodriguez do not possess the necessary training and expertise to determine when and if a patient may be eligible for Hepatitis C treatment.  All they can do is to ensure that qualified medical staff are monitoring the patient's condition and making treatment decisions based on their findings.   That is precisely what occurred in this case.  There is no basis for a finding of deliberate indifference on the part of defendants Armstrong, Tokarz, Ottolini or Rodriguez.

### 5.     Dr. Jack Maleh

Dr. Jack Maleh was the staff physician at Cheshire C.I.  He left his position with DOC in June, 2002 due to health reasons and died in August, 2004.  (Local Rule 56(a)1 Statement, para. 5).  On May 14, 2002, Dr. Maleh ordered a number of lab tests to confirm the Hepatitis C and evaluate the plaintiff's liver functions.  This was Dr. Maleh's only contact with the plaintiff as he

left DOC in June, 2002.  The tests ordered by Dr. Maleh were quite appropriate and his actions were in full compliance with the standard of care.  (Local Rule 56(a)1 Statement, para. 38).  Dr. Maleh was not deliberately indifferent to the plaintiff's medical needs.

### 6.    Dr. Kevin Dieckhaus

Dr. Dieckhaus is an Infectious Disease Specialist affiliated with the University of Connecticut Health Center who conducted Infectious Disease Clinics ("I.D. Clinics") at Cheshire C.I. until September, 2002 under a contract with DOC.  (Dieckhaus Affidavit, paras. 2-4).  On June 13, 2002, he reviewed the results of the lab tests that had been ordered by Dr. Maleh.  He noted that the plaintiff's ALT level of 52 was only slightly above normal and that the plaintiff did not meet the Correctional Managed Health Care ("CMHC") and National Institute of Health ("NIH") guidelines for referral for Hepatitis C treatment.  Dr. Dieckhaus wrote an order for the lab tests to be repeated in December, 2002 in accordance with accepted protocol.  (Local Rule 56(a)1 Statement, para. 41).

In June, 2002, the CMHC was following guidelines recommended by the NIH for the management of chronic Hepatitis C.  In evaluating a patient for Hepatitis C therapy, the procedure called for periodic liver function studies to determine whether transaminase values remained at least as high as 1.5 times the upper normal range for a period of at least six months. The plaintiff did not meet those standards in June, 2002.  (Local Rule 56(a)1 Statement, para. 42).  As noted supra, Dr. Dieckhaus ended his contract with DOC in September, 2002.  Except for his review of the plaintiff's lab test results in June, 2002, Dr. Dieckhaus did not have any further involvement with the plaintiff's case.  (Local Rule 56(a)1 Statement, para. 43).

The actions of Dr. Dieckhaus were entirely appropriate and in accordance with the accepted standard of care. (Local Rule 56(a)1 Statement, para. 44). There is no basis for a finding of deliberate indifference with respect to Dr. Dieckhaus.

## 7. Patricia Pace, R.N., and Pamela Shea, R.N.

On December 20, 2002, the plaintiff filed a medical grievance seeking treatment for his Hepatitis C. Patricia Pace, R.N., was the grievance coordinator at Cheshire C.I. at that time. In her response to the plaintiff's grievance, Ms. Pace correctly noted that the plaintiff had been seen by the facility physician on December 11, 2002 and that the facility physician would be referring the plaintiff to the Infectious Disease Specialist upon completion of the preliminary blood work. This was an appropriate and accurate response by Ms. Pace. She cannot make treatment decisions. She determined that the physician was pursuing the evaluation of the plaintiff's Hepatitis C condition which is all that she could do. (Local Rule 56(a)1 Statement, para. 52). There was no deliberate indifference on the part of Patricia Pace.

In paragraph 44 of his Complaint, the plaintiff criticizes Pamela Shea, R.N., for denying a Level Two grievance on January 21, 2003. The DOC cannot locate any Level Two grievance dated January 21, 2003. The plaintiff did file another Level One grievance on July 21, 2003 claiming that Pamela Shea was not allowing infectious disease nurses to perform their duties relating to his Hepatitis C. In response, Ms. Shea correctly noted that the Hepatitis C paperwork had been submitted to the Hep CURB. The paperwork had to be completed by the facility physician and the Infectious Disease Specialist. Ms. Shea was simply reporting that the paperwork had been submitted. Her response was correct and appropriate. (Local Rule 56(a)1 Statement, para. 53). There is no basis to any claim of deliberate indifference on the part of Ms. Shea.

To the extent that the plaintiff may be complaining about the grievance procedures and/or the manner in which his grievances were handled, he has not made any claim of a denial of due process or lack of access to the grievance procedure. Even if the plaintiff had raised a due process claim with respect to the DOC medical grievance procedure, it is well recognized that a failure "to follow the grievance procedures set forth in Administrative Directive 9.6 does not demonstrate the denial of a constitutionally or federally protected right. …" Allen v. Armstrong, et al., No. 3:00CV1823 (DJS)(TPS), Ruling and Order dated August 1, 2003, attached hereto as Attachment F.

### 8.     Dr. Edward Blanchette

The Complaint does not contain any substantive allegations relating to Dr. Blanchette except to state that he is the "Chief Doctor" for DOC and that he received a copy of the plaintiff's letter dated May 1, 2002. Dr. Blanchette's only direct involvement with the day-to-day care of the plaintiff occurred on October 1, 2002 when, as the on-call physician, he ordered some blood pressure medication for the plaintiff. He is also a member of the Hep CURB that approved the plaintiff for a liver biopsy on September 10, 2003 and then subsequently approved the plaintiff for Hepatitis C therapy on November 12, 2003. (Local Rule 56(a)1 Statement, para. 59). There is no indication that Dr. Blanchette was even aware of the plaintiff until May 1, 2002.

From May 1, 2002 forward, the plaintiff was being followed at Cheshire C.I. by the facility physician and the Infectious Disease Specialists assigned to that facility. They continued to monitor the plaintiff's condition under the CMHC/NIH guidelines in effect in 2002 and later under the comprehensive Hepatitis C Management and Treatment Policy which became effective in December, 2002. In 2002, the plaintiff did not meet the accepted criteria for Hepatitis C treatment. Upon completion of all of the blood work and assessments required under the new

comprehensive protocol, the Infectious Disease Specialist of Cheshire C.I. referred the plaintiff to the Hep CURB in July, 2003. The Hep CURB thereafter approved the plaintiff for Hepatitis C therapy. Following completion of the therapy in October, 2004, indications are that the therapy was successful. Another viral load study will be done in May, 2005 to determine whether the plaintiff can be classified as a long-term responder to the Hepatitis C therapy. (Local Rule 56(a)1 Statement, paras. 38-51).

While Dr. Blanchette was not involved in the assessment and evaluation of the plaintiff until the referral to the Hep CURB in July, 2003, he believes that the plaintiff received proper evaluation and monitoring by the facility physicians and the Infectious Disease Specialists leading up to the referral to the Hep CURB. In his opinion, there is a strong likelihood that the plaintiff benefited by receiving the Pegasys form of Interferon which was not available until December, 2002. (Local Rule 56(a)1 Statement, paras. 54-58).

There is no evidence to suggest that Dr. Blanchette was deliberately indifferent to the plaintiff's medical needs.

### 9.    Plaintiff's Transfer To The Wallens Ridge State Prison In Virginia

In paragraphs 36 and 37 of the Amended Complaint, the plaintiff complains about his transfer to the Wallens Ridge State Prison on April 5, 2000. The transfer of specific inmates was a classification decision based on the space constraints in Connecticut and the maximum security level of Wallens Ridge. There is no claim that any of the defendants in this case had any direct involvement in the decision to transfer the plaintiff to Wallens Ridge.

While at Wallens Ridge, the plaintiff refused lab tests including tests that would have confirmed his Hepatitis C and led to the monitoring of his hepatic function. (Local Rule 56(a)1 Statement, para. 24). Connecticut has had inmates at Wallens Ridge whose Hepatitis C status

was monitored by the medical staff there.  When and if their liver enzyme values reached a level where further Hepatitis C therapy evaluation was appropriate under NIH guidelines, they would be returned to Connecticut for further evaluation as to the appropriateness of Hepatitis C treatment.  (Local Rule 56(a)1 Statement, para. 25).

The plaintiff requested on three separate occasions to be allowed to remain in Virginia. The Interstate Compact Office did not receive any complaints from the plaintiff regarding his transfer to Wallens Ridge or the adequacy of the medical care he received there.  (Local Rule 56(a)1 Statement, paras. 26-27).    The plaintiff's claim that his transfer to Wallens Ridge was inappropriate is belied by his repeated requests to remain there.  The plaintiff's transfer to Wallens Ridge was an appropriate classification decision and did not evidence any deliberate indifference to his medical needs.  When the medical staff at Wallens Ridge attempted to evaluate his Hepatitis C, he refused to cooperate.

### E.    The Defendants Are Entitled To Qualified Immunity.

The doctrine of qualified immunity shields state officials from liability for damages if their actions did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982).   The Second Circuit has described the circumstances where qualified immunity would apply as follows:

> a government official sued in his individual capacity … is entitled to qualified immunity in any of three circumstances:  (1) if the conduct attributed to him is not prohibited by federal law …; or (2) where the conduct is so prohibited, if the plaintiff's right not to be subjected to such conduct by the defendant was not clearly established at the time of the conduct …; or (3) if the defendant's actions was 'objective[ly] legal[ly] reasonable[ ] … in light of the legal rules that were clearly established at the time it was taken.' These three issues should be approached in sequence, for if the second is resolved favorably to the official, the third becomes moot; a favorable resolution of the first moots both the second and the third.

X-Men Security, Inc. v. Pataki, 196 F.3d 56, 65-66 (2d Cir. 1999) (citations omitted).

A right is clearly established if a reasonable person in the defendant's position should know that his or her actions violate that right. The unlawfulness must be apparent. McCullough v. Wyandanch Union Free Sch. Dist., 187 F.3d 272, 278 (2d Cir. 1999) (citation omitted). In other words, a state official should not be forced to have to defend his actions against civil rights challenges unless the state of the law at the time of the alleged conduct gave him "fair warning" that his actions were unlawful. Hope v. Pelzer, 122 U.S. 1508, 1516 (2002).

As discussed supra, none of the defendants in this case acted in a manner prohibited by federal law.

The actions of the defendants were in accordance with guidelines established by the NIH and the CMHC's policy on Hepatitis C management and treatment. The courts have consistently held that a denial of Hepatitis C therapy based upon the medical judgment of a physician as to the patient's eligibility for such treatment and/or the advisability of such treatment does not constitute deliberate indifference. It was objectively reasonable for the custody defendants in this case to believe that they could reasonably rely upon the medical judgment and expertise of the medical professionals. It was also objectively reasonable for the medical defendants to believe that their medical judgment, based on years of Infectious Disease management and treatment experience, was reasonable and in accordance with accepted standards of care.

F.     **Alleged Violation Of Conn. Gen. Stat. § 19a-103**

1.     **This Claim Is Not Cognizable Under 42 U.S.C. § 1983**

The plaintiff alleges that defendants Armstrong, Myers, Murphy, Rodriguez, Tokarz, Ottolini and Blanchette violated his rights under Conn. Gen. Stat. § 19a-103 which is set forth in footnote 1 supra. The statute basically provides that the person in charge of a correctional

institution shall provide for examination and necessary treatment of persons with communicable diseases admitted thereto for a period of ten days or longer.

To the extent that the plaintiff seeks relief pursuant to 42 U.S.C. § 1983 for alleged violations of state law, his claims are not cognizable. As the Supreme Court observed in Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 106, 104 S. Ct. 900, 911 (1984):

> [a] federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment. We conclude that Young and Edelman are inapplicable in a suit against state officials on the basis of state law.

Thus, to the extent that the plaintiff is attempting to bring a § 1983 claim against state officials for violation of state law, his complaint fails to state a claim upon which relief may be granted.

**2.      Conn. Gen. Stat. § 19a-103 Does Not Provide For A Statutory Right To Bring A Civil Action For Money Damages**

Conn. Gen. Stat. § 19a-103 is a Public Health law directed at efforts to prevent the spread of communicable diseases. To the extent that it applies to "the person in charge of each institution," i.e., wardens or commissioners, it would obviously only apply to wardens or commissioners acting in their official capacity. The statute does not contain any language authorizing a plaintiff to bring a suit against the State, the Commissioner or any of the wardens. It does not authorize anyone to bring a suit against anyone for alleged violations of the statute.

In determining whether a state statute was intended to authorize suit against the State or state officials, the Connecticut Supreme Court set forth the following principles:

> A legislative decision to waive sovereign immunity must be manifested either by the use of express terms or by force of necessary implication … Moreover, because such statutes are in derogation of the common law, [a]ny statutory waiver of immunity must be narrowly construed; … and its scope must be confined strictly to the extent the statute provides.

Mahoney v. Lensink, 213 Conn. 548, 555-56, 569 A.2d 518 (1990) (Internal quotation marks omitted; citations omitted).

It is clear from the language of Conn. Gen. Stat. § 19a-103 that there was no attempt by the legislature to abrogate sovereign immunity by allowing a direct cause of action against the state or state officials for alleged violations of the statute. In the absence of a statutory authorization to bring suit for an alleged violation of the statute, the plaintiff must seek a waiver of sovereign immunity from the Claims Commissioner before bringing any action based on an alleged violation of Conn. Gen. Stat. § 19a-103. See Miller v. Eagan, 265 Conn. 301, 313-316 (2003) and cases cited therein.

### 3.    The Defendants Did Not Violate Conn. Gen. Stat. § 19a-103

Neither Warden Myers nor Warden Murphy were aware that the plaintiff had Hepatitis C. They did have medical staff assigned to their facilities and would rely on their medical skills in evaluating and treating patients unless and until a problem was brought to their attention. There was no problem brought to their attention regarding the plaintiff.

With respect to Warden Rodriguez, Commissioner Armstrong had Patricia Ottolini investigate the plaintiff's letter of May 1, 2002 and respond to the letter for all of the various recipients of the letter. The information provided to the recipients of the letter reflected the fact that appropriate lab tests had been ordered and that the test results would be reviewed by the Infectious Disease Specialist. Thereafter, the plaintiff was monitored and evaluated by Infectious Disease Specialists culminating with the commencement of Hepatitis C treatment in November, 2003. The statute provides for treatment as necessary and the plaintiff was provided with Hepatitis C treatment when it was deemed appropriate by the health professionals who had been monitoring his condition.

24

There is no evidence of any violation of Conn. Gen. Stat. § 19a-103 on the part of these defendants.

### 4. Even If Conn. Gen. Stat. § 19a-103 Did Purport To Authorize A Cause Of Action For An Alleged Violation Of Its Terms, This Court Should Decline To Assume Supplemental Jurisdiction Over This State Law Claim

The exercise of supplemental jurisdiction over related state claims is a matter of discretion. The Court may decline to exercise supplemental jurisdiction under the following circumstances:

(1) The claim raises a novel or complex issues of State law,
(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
(3) the district court has dismissed all claims over which it has original jurisdiction, or
(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).

In this case, there is no evidence to support a claim of a violation of the plaintiff's rights under the Eighth Amendment. Since the plaintiff has no valid federal claim, the Court should decline to exercise supplemental jurisdiction over his state law claim. See Spear v. Town of West Hartford, 771 F. Supp. 521, 530 (D. Conn. 1991) ("absent unusual circumstances, the court would abuse its discretion were it to retain jurisdiction of the pendant state law claim on the basis of a federal question claim already disposed of"), aff'd, 954 F.2d 63 (2d Cir.); cert. denied, 506 U.S. 819 (1992).

## IV.   CONCLUSION

For all of the foregoing reasons, the defendants' Motion for Summary Judgment should be granted.

DEFENDANTS
John Armstrong, et al.

RICHARD BLUMENTHAL
ATTORNEY GENERAL

BY:     _____/s/_____
Richard T. Couture
Assistant Attorney General
110 Sherman Street
Hartford, CT  06105
Federal Bar #ct05480
E-Mail:  richard.couture@po.state.ct.us
Tel.: (860) 808-5450
Fax: (860) 808-5591

## CERTIFICATION

I hereby certify that a copy of the foregoing was sent by first class mail, postage prepaid, this 22nd day of December, 2004, to:

Michael Hartsock, Inmate No. 128651
Cheshire Correctional Institution
900 Highland Avenue
Cheshire, CT  06410

_____/s/_____
Richard T. Couture
Assistant Attorney General