UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  | PRISONER |
|---|---|---|
| MICHAEL HARTSOCK | : | CIVIL NO. 3:03CV735 (JCH)(HBF) |
| v. | : |  |
| JOHN ARMSTRONG, ET AL. | : | DECEMBER 22, 2004 |

### DEFENDANTS' LOCAL RULE 56(a)1 STATEMENT

The defendants respectfully represent, pursuant to Local Rule 56(a)1, that the following material facts are not in dispute:

1. Edward Blanchette, M.D., has been licensed to practice Medicine in the State of Connecticut since 1975. He is Board Certified in Internal Medicine and Infectious Diseases. (Blanchette Affidavit, paras. 1-3).

2. Dr. Blanchette is currently the Director of Clinical Services for the Connecticut Department of Correction ("DOC"). He has conducted Infectious Disease Clinics ("I.D. Clinics") at several correctional facilities during the period 1990 to the present. Currently, he conducts I.D. Clinics at the MacDougall-Walker Correctional Institution ("M-WCI") in Suffield, Connecticut and the Bridgeport Correctional Center. (Blanchette Affidavit, para. 5).

3. Kevin Dieckhaus, M.D., is a physician licensed to practice Medicine in the State of Connecticut since 1992. He is Board Certified in Internal Medicine and Infectious Diseases. He is an Assistant Professor of Medicine, Division of Infectious Diseases, University of Connecticut School of Medicine. (Dieckhaus Affidavit, paras. 1-3; Exhibit A of Dieckhaus Affidavit).

4. Dr. Dieckhaus was employed part-time as an Infectious Disease consultant with DOC from January, 1998 to September, 2002. During that period of time he conducted I.D. Clinics at the Cheshire Correctional Institution ("Cheshire C.I."). (Dieckhaus Affidavit, para. 4).

5. Jack Maleh, M.D., was a staff physician at Cheshire C.I. He left his position with DOC in June, 2002 for health reasons and died in August, 2004. (Blanchette Affidavit, paras. 21-22).

6. Patricia Ottolini, R.N., is currently the Director of Health and Addiction Services for DOC. In May, 2002, she held the position of Correctional Health Services Program Director. (Ottolini Affidavit, para. 1).

7. Brian Murphy served as the Lead Warden at M-WCI from May, 2001 to April, 2003. (Murphy Affidavit, para. 2).

8. Larry Myers was the Warden of the Northern Correctional Institution ("NCI") from April, 1999 until his retirement in April, 2003. (Garner Affidavit, para. 2).

9. Kathleen Garner has been the Administrative Assistant to the NCI warden since 1998. (Garner Affidavit, para. 1).

10. Patricia Wollenhaupt, R.N., has held various positions with DOC since 1985. She began working at NCI in August, 1999. (Wollenhaupt Affidavit, paras. 1 and 4).

11. Lynn Milling is currently a Major in the Connecticut DOC Interstate Compact Office and has worked in the Interstate Compact Office since 1990. The Interstate Compact Office facilitates the transfer of inmates to and from the State of Connecticut under the Interstate Compact Agreement. (Milling Affidavit, paras. 1 and 2).

12. The plaintiff was initially incarcerated in 1984. On April 25, 1986, he was transferred to the Federal Bureau of Prisons where he remained until his return to the

Connecticut DOC on March 4, 1999. (Blanchette Affidavit, para. 9; Exhibit A to Blanchette Affidavit).

13. At the time that the plaintiff reported from the Federal Bureau of Prisons to the Walker Correctional Institution in March, 1999, it was reported that he had a history of being positive for Hepatitis C. (Blanchette Affidavit, para. 10; Exhibit B to Blanchette Affidavit).

14. There is no reference in the plaintiff's medical record that he requested Hepatitis C treatment in March, 1999 or that he was requesting that the staff at NCI obtain part or all of his medical records from the Federal Bureau of Prisons. (Blanchette Affidavit, para. 11; Exhibit C to Blanchette Affidavit).

15. On October 19, 1999, the plaintiff sent a request to the NCI medical unit asking for treatment for Hepatitis C. (Blanchette Affidavit, para. 12; Exhibit D to Blanchette Affidavit).

16. On October 26, 1999, the physician at NCI ordered various blood tests for the plaintiff including liver function studies. The blood test results at that time showed that the plaintiff had pretty good hepatic function (Bilirubin, Albumin) although his liver enzyme levels (AST and ALT), otherwise known as transaminase values, were somewhat elevated. (Blanchette Affidavit, para. 13; Exhibit E to Blanchette Affidavit).

17. An extensive search of the correspondence files at the Warden's office at NCI did not reveal any communication from the plaintiff to Warden Larry Myers relating to Hepatitis C or any other subject. (Garner Affidavit, para. 3).

18. In paragraph 22 of his Amended Complaint, the plaintiff has alleged that on one occasion in November, 1999, Patricia Wollenhaupt, R.N., stated to him during a tour of NCI that he did not look like a candidate to be treated for the Hepatitis C virus. This is the only allegation in the Complaint relating to Patricia Wollenhaupt.

19. When she was at NCI, Patricia Wollenhaupt would make weekly tours of the facility. She does not remember the plaintiff or having any conversation with him regarding Hepatitis C. She did not make any entries in his medical chart. If she had seen the plaintiff on any sort of formal visit to the medical unit, she would have made a chart entry. (Wollenhaupt Affidavit, para. 4; Exhibit A to Wollenhaupt Affidavit).

20. Only a physician can determine a patient's eligibility for Hepatitis C treatment. As an R.N., Patricia Wollenhaupt does not have the training or the authority to make any treatment decisions regarding Hepatitis C. (Wollenhaupt Affidavit, para. 6).

21. During the period October 29, 1999 to December 3, 1999, Ms. Wollenhaupt was on a leave of absence from work. She could not have run into the plaintiff at NCI in November, 1999. (Wollenhaupt Affidavit, para. 5).

22. On April 5, 2000, the plaintiff was transferred from NCI to M-WCI. At that time it was noted in the record that he had a history of Hepatitis C, hypertension, and a gunshot wound and that he appeared physically and mentally stable. (Blanchette Affidavit, para. 14; Exhibits B and C to Blanchette Affidavit).

23. On April 19, 2000, the plaintiff was transferred to the Wallens Ridge State Prison in Virginia under the Interstate Compact Agreement. (Blanchette Affidavit, para. 15; Exhibit A to Blanchette Affidavit).

24. While at Wallens Ridge, the plaintiff refused lab tests including tests that would have confirmed his Hepatitis C and led to the monitoring of his hepatic function. (Blanchette Affidavit, para. 16; Exhibit F to Blanchette Affidavit).

25. Connecticut has had inmates at Wallens Ridge whose Hepatitis C status was monitored by the medical staff there. When and if their liver enzyme values reached a level

where further Hepatitis C therapy evaluation was appropriate under National Institute of Health ("NIH") guidelines, then the Connecticut DOC would bring the inmate back to Connecticut for further evaluation as to the appropriateness of Hepatitis C treatment. In the plaintiff's case, he refused a variety of lab tests including a Hepatitis C panel while at Wallens Ridge. (Blanchette Affidavit, para. 17).

26.     While at the Wallens Ridge State Prison in Virginia, the plaintiff requested on three separate occasions to be allowed to remain incarcerated in Virginia. (Milling Affidavit, para. 4; Exhibit A to Milling Affidavit).

27.     The Interstate Compact Office did not receive any complaints from the plaintiff regarding his transfer to Wallens Ridge or the adequacy of the medical care he received there. (Milling Affidavit, para. 5).

28.     The plaintiff returned to M-WCI from Virginia on August 13, 2001. (Blanchette Affidavit, para. 19; Exhibit A to Blanchette Affidavit).

29.     The transfer reception screening sheet that was completed upon the plaintiff's return to Connecticut as well as the medical chart entry dated August 14, 2001 reflect that the plaintiff denied any medical or mental health issues upon is return to Connecticut except for a complaint relating to a back injury. (Blanchette Affidavit, para. 20; Exhibits B and C to Blanchette Affidavit).

30.     There is no reference in the plaintiff's medical chart to any discussion about Hepatitis C to any medical staff at M-WCI during the period that the plaintiff was at that facility from August 13, 2001 to March 7, 2002. (Blanchette Affidavit, para. 20; Exhibit C to Blanchette Affidavit).

31. Warden Brian Murphy does not recall having any conversation with the plaintiff at M-WCI regarding Hepatitis C. (Murphy Affidavit, para. 4).

32. An extensive search of the correspondence file in the Warden's office at M-WCI has not revealed any communication from the plaintiff relating to Hepatitis C. (Murphy Affidavit, para. 5).

33. Warden Murphy was not aware that the plaintiff had Hepatitis C until he was served with a copy of the Complaint in this matter in August, 2003. (Murphy Affidavit, para. 6).

34. If the plaintiff had communicated with Warden Murphy regarding any concerns about his Hepatitis C, Warden Murphy would have communicated with the medical staff at M-WCI regarding those concerns. Warden Murphy is not a medical practitioner and he cannot make any decisions as to when or if treatment for Hepatitis C may be appropriate in any given case. As the Warden of M-WCI, Warden Murphy would typically rely upon the medical advice of the physicians as to the medical conditions of inmates, the need for treatment and the appropriateness of any required treatment. (Murphy Affidavit, para. 7).

35. The plaintiff transferred from M-WCI to Cheshire C.I. on March 7, 2002. (Blanchette Affidavit, para. 21; Exhibit A to Blanchette Affidavit).

36. On May 1, 2002, the plaintiff sent a notice to various administrative officials and physicians within DOC demanding treatment for his Hepatitis C. (Ottolini Affidavit, para. 3; Exhibit B to Ottolini Affidavit).

37. Commissioner Armstrong asked Patricia Ottolini to investigate the plaintiff's Hepatitis C status and respond to his letter on behalf of himself, Deputy Commissioner Jack Tokarz and Cheshire C.I. Warden Hector Rodriguez. (Ottolini Affidavit, para. 4).

38. On May 14, 2002, Dr. Jack Maleh at Cheshire C.I. ordered a number of lab tests to confirm the Hepatitis C and evaluate the plaintiff's liver functions. He also requested that staff obtain a copy of the plaintiff's records form the Federal Bureau of Prisons. This was Dr. Maleh's only contact with the plaintiff as he left his position with DOC due to illness in June, 2002 and died in August, 2004. The tests ordered by Dr. Maleh were quite appropriate and his actions as they relate to the plaintiff were in full compliance with the standard of care. (Blanchette Affidavit, para. 22; Exhibit I to Blanchette Affidavit).

39. On May 22, 2002, Patricia Ottolini sent a letter to the plaintiff noting that Dr. Maleh had ordered blood tests on May 14, 2002 to ascertain his current Hepatitis C status. She also assured the plaintiff that the results of the tests would be reviewed to determine a proper course of treatment. (Ottolini Affidavit, para. 6; Exhibit C to Ottolini Affidavit).

40. Following Patricia Ottolini's response to the plaintiff on May 22, 2002, the Commissioner's office did not receive any further communication form the plaintiff. (Ottolini Affidavit, para. 8).

41. On June 13, 2002, Dr. Kevin Dieckhaus reviewed the results of the lab studies that had been ordered by Dr. Maleh. He noted that the plaintiff's ALT level of 52 was only slightly above normal and that the plaintiff did not meet the Correctional Managed Health Care ("CMHC") and NIH guidelines for referral for Hepatitis C treatment. Dr. Dieckhaus wrote an order for the lab tests to be repeated in December, 2002 in accordance with accepted protocol. (Dieckhaus Affidavit, paras. 5 and 6; Blanchette Affidavit, para. 24; Exhibits C and D to Dieckhaus Affidavit).

42. In June, 2002, the CMHC was following guidelines recommended by the NIH for the management of chronic Hepatitis C. In evaluating a patient for Hepatitis C therapy, the

procedure called for periodic liver function studies to determine whether transaminase values remained at least as high as 1.5 times the upper normal range for a period of at least six months. As noted by Dr. Dieckhaus, the plaintiff did not meet the treatment guidelines in June, 2002. (Blanchette Affidavit, para. 25; Exhibit k to Blanchette Affidavit; Dieckhaus Affidavit, para. 8).

43. Dr. Dieckhaus ended his affiliation with DOC in September, 2002 so that he could devote more time to his practice and other duties at the University of Connecticut Health Center. Except for his review of the plaintiff's lab test results in June, 2002, Dr. Dieckhaus did not have any further involvement with the plaintiff's care. (Dieckhaus Affidavit, para. 7).

44. The actions of Dr. Dieckhaus with respect to his evaluation of the plaintiff's lab results and his order to repeat the lab tests in six months were entirely appropriate and in accordance with the accepted standard of care. (Blanchette Affidavit, para. 24; Dieckhaus Affidavit, para. 8).

45. The CMHC issued a comprehensive Hepatitis C Management and Treatment Policy which became effective in December, 2002. The Hepatitis C Policy established a Hepatitis C Review Board ("Hep CURB") to review requests for Hepatitis C treatment. The Hep CURB consists of Dr. Blanchette and two other Infectious Disease Specialists. (Blanchette Affidavit, para. 26; Exhibit L to Blanchette Affidavit).

46. As part of the Hepatitis C evaluation and referral process set forth in the policy, the Infectious Disease Specialist assigned to the inmate's facility must carefully evaluate the inmate's history and test results to determine the appropriateness of a referral to the Hep CURB for further evaluation and review. The assessment, management and treatment of Hepatitis C is a complex undertaking requiring an understanding of the indications for treatment, the contraindications to treatment, the possible side effects and complications from treatment and an

understanding of the physical and mental health history of the patient and how the history may affect the efficacy of the treatment. (Blanchette Affidavit, para. 27).

47.     Following additional blood work completed during the period December, 2002 through March, 2003, the plaintiff was seen by the Infectious Disease Specialist Dr. James O'Halloran on April 9, 2003. Dr. O'Halloran agreed at that time to complete the evaluations and assessments required by the Hepatitis C protocol while noting that the plaintiff's most recent ALT level was nearly normal. (Blanchette Affidavit, para. 28; Exhibit C to Blanchette Affidavit).

48.     Upon completion of the various evaluations and reports, the documentation was faxed to the Hep CURB on July 16, 2003. The Hep CURB approved a liver biopsy on September 10, 2003. The liver biopsy was done on October 28, 2003. The findings were consistent with chronic Hepatitis C of moderate severity. (Blanchette Affidavit, para. 29; Exhibits C, M, N and O to Blanchette Affidavit).

49.     On November 12, 2003, the Hep CURB approved the plaintiff for Hepatitis C therapy. (Blanchette Affidavit, para. 30; Exhibit P to Blanchette Affidavit).

50.     The plaintiff began his course of Hepatitis C therapy with Pegasys and Ribavirin on November 24, 2003. An HCV viral load report of March 11, 2004 showed a non-detectable viral load which indicates that the treatment was effective at that stage in clearing the virus. Because of the favorable studies in March, 2004, the HCV treatment was continued for the remainder of the forty-eight week period. (Blanchette Affidavit, para. 31; Exhibit E to Blanchette Affidavit).

51.     The plaintiff concluded his HCV therapy on October 25, 2004. During the course of his treatment, his ALT and AST levels remained in the normal range. Another viral load

study will be done in April or May, 2005. If the plaintiff's HCV viral load remains undetectable at that time, the plaintiff will be classified as a long-term responder and the therapy will be considered successful. (Blanchette Affidavit, para. 32; Exhibit E and L to Blanchette Affidavit).

52.     On December 20, 2002, the plaintiff filed a medical grievance seeking treatment for his Hepatitis C. Patricia Pace, R.N., was the grievance coordinator at Cheshire C.I. at that time. In her response to the plaintiff's grievance, Ms. Pace correctly noted that the plaintiff had been seen by the facility physician on December 11, 2002 and that the facility physician would be referring the plaintiff to the Infectious Disease Specialist upon completion of the preliminary blood work. This was an entirely appropriate and accurate response by Ms. Pace. Ms. Pace is not a doctor. She does not have the training, experience or authority to make treatment decisions regarding Hepatitis C. She did satisfy herself that the physician was pursuing the evaluation of the plaintiff's Hepatitis C condition which is all that she could do. (Blanchette Affidavit, para. 33; Exhibit Q to Blanchette Affidavit).

53.     In paragraph 44 of his Complaint, the plaintiff criticizes Pamela Shea, R.N., for denying a Level Two grievance on January 21, 2003. The DOC has not been able to locate any Level Two grievance from the plaintiff dated January 21, 2003. The plaintiff did file another Level One grievance on July 21, 2003 claiming that Pamela Shea was not allowing infectious disease nurses to perform their duties relating to his Hepatitis C. In response, Ms. Shea correctly noted that the Hepatitis C paperwork had been submitted to the Hep CURB. The paperwork had to be completed by the facility physician and the Infectious Disease Specialist. Ms. Shea was simply reporting that the paperwork had been submitted. Her response to the plaintiff's grievance was quite appropriate. (Blanchette Affidavit, para. 34; Exhibits M and R to Blanchette Affidavit).

54. Hepatitis C is a chronic disease. In most cases it takes over thirty years for an individual with Hepatitis C to develop serious liver problems. (Blanchette Affidavit, para. 35).

55. As noted in the lab report of March 18, 2003, the plaintiff has a HCV genotype of 1a. Persons with genotype 1 are more resistant to Hepatitis C therapy than persons with genotypes 2 or 3. In general, persons with a genotype 1 have only a 45% successful response rate. (Blanchette Affidavit, para. 36; Exhibit E to Blanchette Affidavit).

56. The current preferred form of interferon treatment called Pegasys did not become available until December, 2002. The interferon treatments available during the period 1999 through 2002 were significantly inferior to Pegasys. Pegasys is a pegulated interferon that remains active in the bloodstream longer and at a more consistent level than earlier medications used in the treatment of Hepatitis C. (Blanchette Affidavit, para. 37).

57. The plaintiff did not meet the Hepatitis C treatment criteria in 2002. Even if he had met the treatment criteria, Dr. Blanchette would have recommended that he wait until the Pegasys became available before beginning his HCV therapy. In Dr. Blanchette's opinion, there is a strong likelihood that the plaintiff benefited by receiving a superior drug that was not available until December, 2002. (Blanchette Affidavit, para. 38).

58. Except for the latter part of 2003, the plaintiff's liver enzyme levels were quite stable. During the past year, his liver enzyme levels have been normal. There is no evidence of any clinically significant progression of the plaintiff's Hepatitis C disease over the past few years. As a result of being treated with the improved form of Interferon, the plaintiff has been given the best possible chance of becoming a long-term responder to Hepatitis C therapy. (Blanchette Affidavit, para. 39).

59. Dr. Blanchette's only direct involvement with the day-to-day care of the plaintiff occurred on October 1, 2002 when, as the on-call physician, he ordered some blood pressure medication for the plaintiff. He is also a member of the Hep CURB that approved the plaintiff for a liver biopsy on September 10, 2003 and then subsequently approved the plaintiff for Hepatitis C therapy on November 12, 2003. (Blanchette Affidavit, para. 7).

60. While Hepatitis C is a communicable disease, it is a blood-borne disease that is transmitted primarily through direct percutaneous exposures to infectious blood such as through injection drug use or transfusion of contaminated blood products. The assessment, management and treatment of Hepatitis C is a complex undertaking requiring an understanding of the guidelines and indications for treatment, the contraindications to treatment, side effects, treatment complications and health history. Only certain patients may be found eligible or suitable for treatment. A correctional administrator cannot evaluate and treat Hepatitis C or make decisions regarding Hepatitis C treatment. Treatment decisions regarding Hepatitis C are typically made by Infectious Disease Specialists such as the members of the Hep CURB. (Blanchette Affidavit, para. 40).

DEFENDANTS
John Armstrong, et al.

RICHARD BLUMENTHAL
ATTORNEY GENERAL

BY:  _____/s/_____
Richard T. Couture
Assistant Attorney General
110 Sherman Street
Hartford, CT 06105
Federal Bar #ct05480
E-Mail: richard.couture@po.state.ct.us
Tel.: (860) 808-5450
Fax: (860) 808-5591

## **CERTIFICATION**

I hereby certify that a copy of the foregoing was sent by first class mail, postage prepaid, this 22nd day of December, 2004, to:

Michael Hartsock, Inmate No. 128651
Cheshire Correctional Institution
900 Highland Avenue
Cheshire, CT  06410

_____/s/_____
Richard T. Couture
Assistant Attorney General