UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MICHAEL HARTSOCK | : | PRISONER<br>CIVIL NO. 3:03CV735 (JCH)(HBF) |
| v. | : | |
| JOHN ARMSTRONG, ET AL. | : | DECEMBER 22, 2004 |

**AFFIDAVIT OF EDWARD BLANCHETTE, M.D., IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Edward Blanchette, M.D., being first duly sworn, deposes and says:

1. I am a physician licensed to practice Medicine in the State of Connecticut since 1975.

2. I completed my Residency in Medicine at Saint Francis Hospital, Hartford, Connecticut, in 1977 and completed a Fellowship in Infectious Disease and Microbiology from the University of Connecticut School of Medicine in 1979.

3. I am Board Certified in Internal Medicine and Infectious Diseases.

4. I have held various positions with the Connecticut Department of Correction ("DOC") since 1984, including Hospital Clinical Director at the Osborn Correctional Institution, Medical Director at the MacDougall Correctional Institution ("MCI"), Acting Director of DOC Health Services and Clinical Practice Coordinator.

5. I am presently the Director of Clinical Services for DOC. I have conducted Infectious Disease Clinics ("I.D. Clinic") at several correctional facilities during the period 1990 to the present. Currently, I conduct I.D. Clinics at the MacDougall-Walker Correctional Institution in Suffield, Connecticut and the Bridgeport Correctional Center.

6. I have been named as a defendant in this case apparently because of my position as the Director of Clinical Services for DOC. The only allegation which I can locate in the Amended Complaint pertaining to me is that I was purportedly one of several people who received a copy of a notice sent by the plaintiff on May 1, 2002 requesting testing and treatment for his Hepatitis C.

7. From my review of the plaintiff's medical records, my only personal involvement in the plaintiff's day-to-day medical care occurred on October 1, 2002 when, as the on-call physician, I ordered some blood pressure medication for the plaintiff. Also, I was one of three Infectious Disease specialists on the Correctional Managed Health Program's ("CMHC") Hepatitis C Utilization Review Board ("Hep CURB") who approved the plaintiff for a liver biopsy on September 10, 2003 and then subsequently approved the plaintiff for Hepatitis C ("HCV") therapy on November 12, 2003.

8. I am familiar with the plaintiff's medical history having reviewed his medical records from the Connecticut DOC, the Virginia DOC and the Federal Bureau of Prisons.

9. The plaintiff was initially incarcerated in 1984. On April 29, 1986, he was transferred to the Federal Bureau of Prisons where he remained until his return to the Connecticut DOC on March 4, 1999. See Inmate Movement Sheet (RT 60) attached hereto as Exhibit A.

10. At the time that the plaintiff reported from the Federal Bureau of Prisons to the Walker Correctional Institution in March, 1999, it was reported that he had a history of being positive for Hepatitis C. See Transfer Summary sheets attached hereto as Exhibit B.

11. I cannot find any reference in the medical records for March, 1999 indicating that the plaintiff was requesting Hepatitis C treatment at that time or that he was requesting that the staff at the Northern Correctional Institution ("NCI") obtain part or all of his medical records from the Federal Bureau of Prisons. See clinical record chart entries for the period 3/4/99 to 11/28/04 attached hereto as Exhibit C.

12. On October 19, 1999, the plaintiff sent a request to the medical unit at NCI asking for treatment of his Hepatitis C. See attached Exhibit D.

13. On October 26, 1999, the physician at NCI ordered various blood tests for the plaintiff including liver function studies. See lab test results for the period 10/26/99 to 10/19/04 attached hereto as Exhibit E. The blood test results at that time showed that the plaintiff has pretty good hepatic function (Bilirubin, Albumin) although his liver enzyme levels (AST and ALT), otherwise known as transaminase values, were somewhat elevated.

14. On April 5, 2000, the plaintiff was transferred from NCI to the MacDougall-Walker Correctional Institution. See Exhibit A. At that time it was noted that the plaintiff had a history of Hepatitis C, hypertension and a gunshot wound and appeared physically and mentally stable. See Exhibits B and C.

15. On April 19, 2000, the plaintiff was transferred to the Wallens Ridge State Prison in Virginia under the Interstate Compact Agreement. See Exhibit A.

16. While at Wallens Ridge, the plaintiff refused lab tests including tests that would have confirmed his Hepatitis C and led to the monitoring of his hepatic function. See Wallens Ridge medical records attached hereto as Exhibit F.

17. We have had inmates at the Wallens Ridge State Prison in Virginia whose Hepatitis C status was monitored by the Wallens Ridge medical staff. When and if their liver enzyme values reached a level where further Hepatitis C therapy evaluation was appropriate under National Institute of Health ("NIH") guidelines, we would then bring the inmate back to Connecticut for further evaluation as to the appropriateness of Hepatitis C treatment. In the plaintiff's case, he refused a variety of lab tests including a Hepatitis panel while at Wallens Ridge.

18. While the plaintiff appears to complain about his transfer to Wallens Ridge in his Complaint in this case, it should be noted that after he arrived in Virginia, he repeatedly asked Connecticut correctional officials if he could remain in Virginia. See affidavit of Lynn Milling and exhibits attached thereto.

19. The plaintiff returned to the MacDougall Correctional Institution ("MCI") from Virginia on August 13, 2001. See Exhibit A.

20. The transfer reception screening sheet that was completed upon the plaintiff's return to Connecticut as well as the medical chart entry dated August 14, 2001 reflect that the plaintiff denied any medical or mental health issues upon his return to Connecticut except for a complaint relating to a back injury. See Exhibits B and C. I cannot find any reference to any discussion about Hepatitis C in the medical chart until the chart entry of Dr. Jack Maleh dated May 14, 2002. See Exhibit C.

21. The plaintiff transferred from MCI to the Cheshire Correctional Institution ("Cheshire C.I.") on March 7, 2002. See Exhibit A. On May 1, 2002, the plaintiff sent a notice to various administrative officials and physicians within the DOC demanding treatment for his

4

Hepatitis C. See attached Exhibit G. In response to the letter of May 1, 2002, Dr. Jack Maleh of the Cheshire C.I. ordered lab tests to evaluate the plaintiff's Hepatitis C status. On behalf of the Commissioner and the other recipients of the plaintiff's letter, Patricia Ottolini, the Correctional Health Services Program Director, sent the plaintiff a written response on May 22, 2002 noting that Dr. Maleh had ordered lab tests to evaluate the plaintiff's Hepatitis C status and reminding the plaintiff that medical issues can be addressed at sick call. See attached Exhibit H.

22. On May 14, 2002, Dr. Maleh ordered a number of lab tests to confirm the Hepatitis C and evaluate the plaintiff's liver functions. He also requested that staff obtain a copy of the plaintiff's records from the Federal Bureau of Prisons. See attached Exhibit I. This was Dr. Maleh's only contact with the plaintiff. He left his position with DOC in June, 2002 due to health reasons and died in August, 2004. The tests ordered by Dr. Maleh were quite appropriate and his actions as they relate to the plaintiff were in full compliance with the standard of care.

23. The results of the lab tests ordered by Dr. Maleh are reflected in the attached Exhibit E. They confirmed that the plaintiff was positive for Hepatitis C and that his HCV was of a genotype 1a. The AST and ALT liver enzyme levels were 60 and 50 respectively.

24. Dr. Kevin Dieckhaus was the Infectious Disease Specialist who conducted the periodic I.D. Clinics at Cheshire C.I. in June, 2002. As the Infectious Disease Specialist, he would evaluate test results and determine appropriate treatment measures for inmates with infectious diseases such as HIV and HCV. After reviewing the plaintiff's lab test results on June 13, 2002, Dr. Dieckhaus correctly noted that plaintiff's transaminase values (ALT and AST) were only moderately elevated and that he did not at that time meet the CMHC and NIH guidelines for referral for Hepatitis C therapy. He further noted that under existing protocol, the

5

Hepatitis profile tests would be repeated in six months and entered an order on the physician order sheet to that effect. See attached Exhibit J. Dr. Dieckhaus ended his work as an Infectious Disease Consultant with DOC in September, 2002 to focus on his many duties at the University of Connecticut Health Center. His only involvement with the plaintiff was to review the lab test results in June, 2002 and to order that the tests be repeated in December, 2002 in accordance with proper Hepatitis C evaluation protocol. The actions of Dr. Dieckhaus in this case were entirely appropriate and in accordance with the accepted standard of care.

25. In June, 2002, the CMHC was following guidelines recommended by the NIH for the management of chronic Hepatitis C. In evaluating a patient for Hepatitis C therapy, the procedure called for periodic liver function studies to determine whether transaminase values remained at least as high as 1.5 times the upper normal range for a period of at least six months. See attached Exhibit K. The plaintiff did not meet the treatment guidelines in June, 2002 as noted by Dr. Dieckhaus.

26. The CMHC issued a comprehensive Hepatitis C Management and Treatment Policy which became effective in December, 2002. See Hepatitis C Policy attached hereto as Exhibit L. The Hepatitis C Policy established a Hepatitis C Review Board ("Hep CURB") to review requests for Hepatitis C treatment. The Hep CURB consists of myself and two other Infectious Disease Specialists.

27. As part of the Hepatitis C evaluation and referral process set forth in the policy, the Infectious Disease Specialist assigned to the inmate's facility must carefully evaluate the inmate's history and test results to determine the appropriateness of a referral to the Hep CURB for further evaluation and review. The assessment, management and treatment of Hepatitis C is

a complex undertaking requiring an understanding of the indications for treatment, the contraindications to treatment, the possible side effects and complications from treatment and an understanding of the physical and mental health history of the patient and how the history may affect the efficacy of the treatment.

28. Following additional blood work completed during the period December, 2002 through March, 2003, the plaintiff was seen by the Infectious Disease Specialist Dr. James O'Halloran on April 9, 2003. Dr. O'Halloran agreed at that time to complete the evaluations and assessments required by the Hepatitis C protocol while noting that the plaintiff's most recent ALT level was nearly normal. See Exhibit C.

29. Upon completion of the various evaluations and reports, the documentation was faxed to the Hep CURB on July 16, 2003. See Exhibits C and M. The Hep CURB approved a liver biopsy on September 10, 2003. See attached Exhibit N. The liver biopsy was done on October 28, 2003. The findings were consistent with chronic Hepatitis C of moderate severity. See attached Exhibit O.

30. On November 12, 2003, the Hep CURB approved the plaintiff for Hepatitis C therapy. See attached Exhibit P.

31. The plaintiff began his course of Hepatitis C therapy with Pegasys and Ribavirin on November 24, 2003. An HCV viral load report of March 11, 2004 showed a non-detectable viral load which indicates that the treatment was effective at that stage in clearing the virus. See Exhibit E. Because of the favorable studies in March, 2004, the HCV treatment was continued for the remainder of the forty-eight week period.

32. The plaintiff concluded his HCV therapy on October 25, 2004. During the course of his treatment, his ALT and AST levels remained in the normal range. See Exhibit E. As indicated in Section 7 of Exhibit L, another viral load study will be done in April or May, 2005. If the plaintiff's HCV viral load remains undetectable at that time, the plaintiff will be classified as a long-term responder and the therapy will be considered successful.

33. On December 20, 2002, the plaintiff filed a medical grievance seeking treatment for his Hepatitis C. Patricia Pace, R.N., was the grievance coordinator at Cheshire C.I. at that time. In her response to the plaintiff's grievance, Ms. Pace correctly noted that the plaintiff had been seen by the facility physician on December 11, 2002 and that the facility physician would be referring the plaintiff to the Infectious Disease Specialist upon completion of the preliminary blood work. See attached Exhibit Q. This was an entirely appropriate and accurate response by Ms. Pace. Ms. Pace is not a doctor. She does not have the training, experience or authority to make treatment decisions regarding Hepatitis C. She did satisfy herself that the physician was pursuing the evaluation of the plaintiff's Hepatitis C condition which is all that she could do.

34. In paragraph 44 of his Complaint, the plaintiff criticizes Pamela Shea, R.N., for denying a Level Two grievance on January 21, 2003. The DOC has not been able to locate any Level Two grievance from the plaintiff dated January 21, 2003. The plaintiff did file another Level One grievance on July 21, 2003 claiming that Pamela Shea was not allowing infectious disease nurses to perform their duties relating to his Hepatitis C. In response, Ms. Shea correctly noted that the Hepatitis C paperwork had been submitted to the Hep CURB. See attached Exhibit R. The paperwork had to be completed by the facility physician and the Infectious

Disease Specialist. <u>See</u> Exhibit M. Ms. Shea was simply reporting that the paperwork had been submitted. Her response to the plaintiff's grievance was quite appropriate.

35. Hepatitis C is a chronic disease. In most cases it takes over thirty years for an individual with Hepatitis C to develop serious liver problems.

36. As noted in the lab report of March 18, 2003, the plaintiff has an HCV genotype of 1a. <u>See</u> Exhibit E. Persons with genotype 1 are more resistant to Hepatitis C therapy than persons with genotypes 2 or 3. In general, persons with a genotype 1 have only a 45% successful response rate.

37. The current preferred form of interferon treatment called Pegasys did not become available until December, 2002. The interferon treatments available during the period 1999 through 2002 were significantly inferior to Pegasys. Pegasys is a pegulated interferon that remains active in the bloodstream longer and at a more consistent level than earlier medications used in the treatment of Hepatitis C.

38. While the plaintiff did not meet the Hepatitis C treatment criteria in 2002, I would have recommended that he wait until the Pegasys became available before beginning his HCV therapy even if he had met the treatment criteria earlier. Although the plaintiff complains about not being provided with Hepatitis C therapy earlier, in my opinion there is a strong likelihood that he benefited by waiting for a far superior drug.

39. The plaintiff's hepatic function (Bilirubin, Albumin) has been consistently stable and his liver enzyme levels were only moderately elevated until April, 2003. <u>See</u> Exhibit E. During the past year, his liver enzyme levels have been normal. There is no evidence of any clinically significant progression of the plaintiff's Hepatitis C disease over the past few years.

As a result of his being treated with the improved form of interferon, the plaintiff has been given the best possible chance of becoming a long-term responder to Hepatitis C therapy.

40. While Hepatitis C is a communicable disease, it is a blood-borne disease that is transmitted primarily through direct percutaneous exposures to infectious blood such as through injection drug use or transfusion of contaminated blood products. The assessment, management and treatment of Hepatitis C is a complex undertaking requiring an understanding of the guidelines and indications for treatment, the contraindications to treatment, side effects, treatment complications and health history. Only certain patients may be found eligible or suitable for treatment. A correctional administrator cannot evaluate and treat Hepatitis C or make decisions regarding Hepatitis C treatment. Treatment decisions regarding Hepatitis C are typically made by an Infectious Disease Specialist such as the members of the Hep CURB.

I, Edward Blanchette, M.D., do hereby swear that the contents of the foregoing affidavit are true and accurate to the best of my knowledge and belief.

_____
Edward Blanchette, M.D.

Subscribed and sworn to, before me, this 21st day of December, 2004.

_____
Richard T. Couture
Commissioner of the Superior Court

10

DEFENDANTS
John Armstrong, et al.

RICHARD BLUMENTHAL
ATTORNEY GENERAL

BY: _____
Richard T. Couture
Assistant Attorney General
110 Sherman Street
Hartford, CT  06105
Federal Bar #ct05480
E-Mail:  richard.couture@po.state.ct.us
Tel.: (860) 808-5450
Fax: (860) 808-5591

## CERTIFICATION

I hereby certify that a copy of the foregoing Affidavit of Edward Blanchette, M.D., with attached exhibits, was sent by first class mail, postage prepaid, this 22nd day of December, 2004, to:

Michael Hartsock, Inmate No. 128651
Cheshire Correctional Institution
900 Highland Avenue
Cheshire, CT  06410

_____
Richard T. Couture
Assistant Attorney General

11