UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| MICHAEL HARTSOCK | : |
| | : PRISONER CASE NO. |
| v. | : 3:03-cv-735 (JCH) |
| | : |
| JOHN ARMSTRONG, et al.[1] | : MAY 9, 2005 |

**RULING RE: DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT [Dkt. No. 27]**

Plaintiff Michael Hartsock ("Hartsock"), currently confined at the Cheshire Correctional Institution in Cheshire, Connecticut, commenced this civil rights action pro se and in forma pauperis pursuant to 28 U.S.C. § 1915. Hartsock alleges that defendants were deliberately indifferent to his serious medical needs when they delayed his treatment for Hepatitis C. Defendants have filed a motion for summary judgment. For the reasons that follow, defendants' motion is granted.

**I.   STANDARD OF REVIEW**

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); SCS Communications, Inc. v. Herrick Co., 360 F.3d 329, 338 (2d Cir. 2004). The moving party may satisfy this burden "by showing–that is pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101,

---

[1] The named defendants are John Armstrong, Larry Myers, Brian K. Murphy, Hector Rodriguez, Jack Tokarz, Dr. Edward Blanchette, Patricia Ottolini, Dr. Dieckhaus, Dr. Jack Maleh, P. Pace, Pamela Shea and Pat Wollenhaupt.

105 (2d Cir. 2002) (per curiam) (internal quotation marks and citations omitted); accord Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995).

A court must grant summary judgment "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact . . . .'" Miner v. Glen Falls, 999 F.2d 655, 661 (2d Cir. 1993) (citation omitted). A dispute regarding a material fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992) (quoting Anderson, 477 U.S. at 248). After discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

When a motion for summary judgment is supported by documentary evidence and sworn affidavits, the nonmoving party must present "specific facts showing that there is a genuine issue for trial." Western World Ins. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990) (citation omitted). "The non-movant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture." Id. (internal quotations and citations omitted).

The court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." Aldrich, 963 F.2d at 523. Thus, "[o]nly when reasonable minds could not differ as to the import

2

of the evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). "'If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper.'" Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 82-83 (2d Cir. 2004) (quoting Gummo v. Village of Depew, 75 F.3d 98, 107 (2d Cir. 1996)).

     A party may not create a genuine issue of material fact by presenting contradictory or unsupported statements. See e.g., Sec. & Exch. Comm'n v. Research Automation Corp., 585 F.2d 31, 33 (2d Cir. 1978). Nor may he rest on the "mere allegations or denials" contained in his pleadings. Goenaga, 51 F.3d at 18 (citation omitted); see also Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993) (holding that party may not rely on conclusory statements or an argument that the affidavits in support of the motion for summary judgment are not credible). A self-serving affidavit which reiterates the conclusory allegations of the complaint in affidavit form is insufficient to preclude summary judgment. See Lujan v. Nat'l. Wildlife Fed'n, 497 U.S. 871, 888 (1990).

## II.     FACTS[2]

In March 1999, the Federal Bureau of Prisons returned Hartsock to the custody of the Connecticut Department of Correction.  Upon his arrival at Northern Correctional Institution, Hartsock reported that he had a history of being positive for Hepatitis C, but did not request treatment.  On October 19, 1999, Hartsock submitted a request to the medical unit at Northern Correctional Institution seeking treatment for Hepatitis C.  On October 26, 1999, the physician ordered various blood tests, including liver function studies.  The tests showed that Hartsock had somewhat elevated liver enzyme levels, but his hepatic function was pretty good.

Defendant Myers was the warden at Northern Correctional Institution from April 1999 through April 2003.  A review of files in the Warden's Office reveals no communications from Hartsock to defendant Myers during the time Hartsock was confined at Northern Correctional Institution.  Defendant Nurse Wollenhaupt began working at Northern Correctional Institution in August 1999.   As part of her duties, she made weekly tours of the facility.  Defendant Wollenhaupt has no recollection of a conversation with Hartsock regarding Hepatitis C.  Hartsock alleges that defendant Wollenhaupt told him in November 1999 that he did not appear to be a candidate for

---

[2]    The facts are taken from defendants' Local Rule 56(a)1 Statement [Dkt. No. 27-3].  Defendants filed their motion for summary judgment on December 23, 2004.  On January 10, 2005, Hartsock was provided notice of his obligation to respond to the motion and of the contents of a proper response.  Hartsock's response was due on January 30, 2005.  To date, he has neither submitted his opposition nor sought additional time within which to do so.  Because Hartsock has not submitted a Local Rule 56(a)2 Statement, defendants' facts are deemed admitted.  See D. Conn. L. Civ. R. 56(a)1 ("All material facts set forth in said statement will be deemed admitted unless controverted by the statement required to be filed and served by the opposing party in accordance with Rule 56(a)2.")

Hepatitis C treatment. However, defendant Wollenhaupt was absent from work from October 29, 1999, through December 3, 1999.

On April 5, 2000, Hartsock was transferred to MacDougall-Walker Correctional Institution. On April 19, 2000, he was transferred to Wallens Ridge State Prison in Virginia under the Interstate Compact Agreement. Upon his arrival in Virginia, Hartsock reported that he had a history of Hepatitis C, but refused to undergo laboratory tests that would have enabled the medical staff to confirm his status and lead to the monitoring of his hepatic function. Other Connecticut inmates testing positive for Hepatitis C were monitored by the medical staff in Virginia. If their liver enzyme values reached a level indicating that Hepatitis C therapy might be appropriate, the inmates were returned to Connecticut for further evaluation. While he was in Virginia, Hartsock did not complain to the Interstate Compact Office about his medical care and requested on three occasions that he be permitted to remain in Virginia.

On April 13, 2001, Hartsock returned from Virginia and was incarcerated at MacDougall-Walker Correctional Institution. Medical entries at the time of his return indicate that Hartsock complained only of a back injury. He made no request for treatment of Hepatitis C at this time. Institutional records and Hartsock's medical records reveal that Hartsock did not request treatment for Hepatitis C from medical staff or any other correctional officials at any other time while he was confined at MacDougall-Walker Correctional Institution.

On March 7, 2002, Hartsock was transferred to Cheshire Correctional Institution. On May 1, 2002, Hartsock send a notice to various correctional officials and physicians

seeking treatment for Hepatitis C.  Defendant Armstrong asked defendant Ottolini to investigate Hartsock's Hepatitis C status and respond to the notice on behalf of himself and defendants Tokarz and Rodriguez.  On May 14, 2002, defendant Maleh ordered several laboratory tests to confirm Hartsock's Hepatitis C status and evaluate his liver functions.  In addition, he directed medical staff to obtain Hartsock's medical records from the Federal Bureau of Prisons.  Shortly thereafter, defendant Maleh left his position with the Department of Correction due to illness.  On May 22, 2002, defendant Ottolini responded to Hartsock's notice.  She stated that defendant Maleh had ordered tests to ascertain his status and informed Hartsock that the physicians would review the test results to determine the proper course of treatment.  Hartsock sent no further communications regarding his Hepatitis C status to the Commissioner's office.

On June 13, 2002, defendant Dieckhaus reviewed the results of the tests ordered by defendant Maleh.  He noted that Hartsock's liver enzyme levels were only slightly above normal and determined that Hartsock did not meet the Correctional Managed Health Care and National Institute of Health guidelines for referral for Hepatitis C treatment.  In compliance with the accepted protocol, defendant Dieckhaus ordered that the tests be repeated in December 2002.  The protocol, established by the National Institute of Health, required period liver function studies to determine whether transaminase values remained at least as 1.5 times as high as the value for the upper normal range for a period of at least six months.  Defendant Dieckhaus terminated his relationship with the Department of Correction in September 2002 and had no further contact with Hartsock.

In December 2002, Correctional Managed Health Care instituted a comprehensive Hepatitis C Management and Treatment Policy. This policy established a Hepatitis C Review Board to review requests for Hepatitis C treatment by inmates. The Review Board was composed of defendant Blanchette and two other infectious disease specialists. Under the new policy, the infectious disease specialist assigned to the inmate's correctional facility would evaluate the inmate's history and test results to determine the appropriateness of a referral to the Review Board for further evaluation and treatment.

From December 2002 through March 2003, Hartsock underwent additional testing. On December 20, 2002, Hartsock submitted a medical grievance seeking treatment for Hepatitis C. Defendant Pace, the grievance coordinator at that time, noted that Hartsock had been seen by the institutional physician on December 11, 2002, and would be referred to the infectious disease specialist when the preliminary blood tests were completed. Hartsock alleges that defendant Shea denied a level 2 grievance on January 21, 2003. Defendants can locate no record of a level 2 grievance on this date.

On April 9, 2003, Hartsock met with Dr. O'Halloran, the infectious disease specialist at Cheshire Correctional Institution. Although Hartsock's liver enzyme levels were nearly normal, Dr. O'Halloran agreed to complete the evaluations and assessments required under the Hepatitis C protocol. The documentation was sent to the Hepatitis C Review Board in July 2003. Also during July 2003, Hartsock filed a grievance claiming that defendant Shea was not permitting the infectious disease

7

nurses to perform their duties.  The grievance was denied because Hartsock's paperwork already had been forwarded to the Hepatitis C Review Board.

The Hepatitis C Review Board approved a liver biopsy on September 10, 2003, and the test was performed on October 28, 2003.  The results were consistent with chronic Hepatitis C of moderate severity.  On November 12, 2003, the Review Board approved Hartsock for Hepatitis C therapy.  Treatment began on November 24, 2003, and concluded on October 25, 2004.

Hartsock was treated with Pegasys and Ribavirin.  Pegasys is a significantly improved form of interferon that was not available until December 2002.  Defendant Blanchette states that, even if Hartsock had been eligible for Hepatitis C treatment earlier, he would have recommended that Hartsock wait until the Pegasys form of interferon was available before beginning Hepatitis C therapy because Hartsock has an HVC genotype that is more resistant to Hepatitis C therapy than persons with other genotypes.  In addition, defendant Blanchette noted that, with the exception of the latter part of 2003, Hartsock's liver enzyme levels were quite stable and have been normal for the last year.  There is no medical evidence of any clinically significant progression of Hartsock's Hepatitis C for the past several years.

### III.    DISCUSSION

Defendants raise six grounds in support of their motion for summary judgment: (1) defendants are immune from damages in their official capacities; (2) the court lacks personal jurisdiction over defendant Maleh because he was not served with a copy of the complaint before his death; (3) all claims against defendants Myers and

Wollenhaupt are time-barred; (4) defendants did not violate any of Hartsock's constitutionally protected rights; (5) defendants are protected by qualified immunity; and (6) any claim premised on a violation of Connecticut General Statutes § 19a-103 is barred by the Eleventh Amendment. Despite being afforded notice of his obligation to respond to the motion, Hartsock has filed no papers in opposition to the motion for summary judgment.

### A.    Official Capacity Claims for Damages

Defendants first argue that all claims for damages asserted against them in their official capacities are barred by the Eleventh Amendment.

Generally, a suit for recovery of money may not be maintained against the state itself, or against any agency or department of the state, unless the state has waived its sovereign immunity under the Eleventh Amendment. See Florida Dep't of State v. Treasure Salvors, Inc., 458 U.S. 670, 684 (1982). Section 1983 does not override a state's Eleventh Amendment immunity. See Quern v. Jordan, 440 U.S. 332, 342 (1979). The Eleventh Amendment immunity which protects the state from suits for monetary relief also protects state officials sued for damages in their official capacity. See Kentucky v. Graham, 473 U.S. 159, 167 (1985). A suit against a defendant in his official capacity is ultimately a suit against the state if any recovery would be expended from the public treasury. See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 101 n.11 (1984).

Hartsock has named all defendants in their official and individual capacities and does not indicate in which capacity he seeks damages. The Eleventh Amendment bars

an action for damages against defendants in their official capacities. Thus, defendants' motion for summary judgment is granted as to all claims for damages in defendants' official capacities.

In addition, Hartsock seeks "injunctive relief where applicable" (Am. Compl. at XII.) Hartsock alleges that defendants have denied Hepatitis C treatment. In support of their motion for summary judgment, defendants have provided evidence that Hartsock has completed Hepatitis C therapy. Thus, the court concludes that any claim for injunctive relief is now moot.

### B.    Deliberate Indifference to a Serious Medical Need

Defendants contend that Hartsock fails to allege facts, let alone come forward with evidence, suggesting that any defendant was deliberately indifferent to his serious medical need. Deliberate indifference by prison officials to a prisoner's serious medical need constitutes cruel and unusual punishment in violation of the Eighth Amendment. See Estelle v. Gamble, 429 U.S. 97, 104 (1976). To prevail on such a claim, however, Hartsock "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to [his] serious medical needs." Id. at 106. He must show intent to either deny or unreasonably delay access to needed medical care or the intent to interfere with prescribed treatment. See id. at 104-05.

Mere negligence will not support a section 1983 claim; "the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law." Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003). Thus, "not every lapse in prison medical care will rise to the level of a constitutional violation." Id. Rather, the conduct

complained of must "shock the conscience" or constitute a "barbarous act." McCloud v. Delaney, 677 F. Supp. 230, 232 (S.D.N.Y. 1988) (citing United States ex rel. Hyde v. McGinnis, 429 F.2d 864 (2d Cir. 1970)). Inmates do not have a constitutional right to the treatment of their choice. See e.g., Dean v. Coughlin, 804 F.2d 207, 215 (2d Cir. 1986). Thus, mere disagreement with prison officials about what constitutes appropriate care does not state a claim cognizable under the Eighth Amendment. See Ross v. Kelly, 784 F. Supp. 35, 44 (W.D.N.Y.), aff'd, 970 F.2d 896 (2d Cir.), cert. denied, 506 U.S. 1040 (1992).

There are both subjective and objective components to the deliberate indifference standard. See Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994). The alleged deprivation must be "sufficiently serious" in objective terms. Wilson v. Seiter, 501 U.S. 294, 298 (1991); see also Nance v. Kelly, 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, J., dissenting) ("'serious medical need' requirement contemplates a condition of urgency, one that may produce death, degeneration, or extreme pain"). The Second Circuit has identified several factors that are highly relevant to the inquiry into the seriousness of a medical condition: "'[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.'" Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (citation omitted). In addition, where the denial of treatment causes plaintiff to suffer a permanent loss or life-long handicap, the medical need is considered serious. See Harrison v. Barkley, 219 F.3d 132, 137 (2d Cir. 2000).

Chronic Hepatitis C is a serious medical condition.  See, e.g., Christy v. Robinson, 216 F. Supp. 2d 398, 413 (D.N.J. 2002) (holding that chronic Hepatitis C is a serious medical need).  The issue in this case, however, is not that Hartsock was misdiagnosed or denied treatment for Hepatitis C, but that he was not provided the drug therapy upon demand.  The issue of a serious medical need is fact-specific; it "must be tailored to the specific circumstances of each case." Smith, 316 F.3d at 185; see also Bender v. Regier, 385 F.3d 1133, 1137 (8th Cir. 2004) (agreeing with district courts determination that, although Hepatitis C infection was a serious medical need, the issue was whether inmate had serious medical need for immediate interferon treatment).

The evidence provided by defendants shows that, although Hartsock requested treatment once in 1999 and again in 2002, he did not meet the criteria for drug therapy as established by the National Institute of Health.  Courts consistently have held that denial of drug therapy for Hepatitis C when physicians determine that the inmate does not meet the eligibility criteria for such treatment does not constitute deliberate indifference to a serious medical need.  See Gresh v. Berks Co., No. CIV.A. 00-5697, 2002 WL 1635394, at *5-6 (E.D. Pa. July 18, 2002) (holding that failure to provide combination drug therapy for Hepatitis C was not deliberate indifference to a serious medical need); McKenna v. Wright, No. 01 Civ. 6571(WK), 2002 U.S. Dist. Lexis 3489, at *20-21 (S.D.N.Y. Mar. 4, 2002) (holding that denial of Hepatitis C therapy based on medical judgment, after consulting Hepatitis C Guidelines and current literature, was not deliberate indifference) (Defs.' Mem. Attachment C); Cardinales v. Bianchi, et al., No. 3:98cv515(DJS)(TPS), slip op. at 11-13 (D. Conn. Mar. 26, 2001) (holding that refusal

to provide Interferon treatment to inmate who did not meet eligibility criteria was not deliberate indifference to a serious medical need).

Defendants have provided Affidavits of defendants Blanchette and Dieckaus. Both doctors state that, prior to approval for Hepatitis C drug therapy, Hartsock did not meet the criteria for such treatment. Hartsock had provided no evidence indicating that he did qualify for earlier treatment. Accordingly, Hartsock has failed to meet his burden of demonstrating the existence of a genuine issue of material fact regarding his treatment for Hepatitis C. Defendants' motion for summary judgment is granted on this ground.

    **C.**    **State Law Claims**

Hartsock also includes claims for violation of state law. Supplemental or pendent jurisdiction is a matter of discretion, not of right. See United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966). Where all federal claims have been dismissed before trial, pendent state claims should be dismissed without prejudice and left for resolution to the state courts. See 28 U.S.C. § 1367(c)(3); see also Gibbs, 383 U.S. at 726.

Defendants contend that Hartsock's claim for violation of Connecticut General Statutes §19a-103 must be dismissed. Because the court has granted summary judgment for defendants on all federal claims, absent plaintiff's opposition, it would be inappropriate for the court to analyze Hartsock's state law claims and determine whether the statute supports a private right of action. The court declines to exercise supplemental jurisdiction over any possible state law claims.

IV.     **CONCLUSION**

Defendants' Motion for Summary Judgment [**Dkt. No. 27**] is **GRANTED**. Hartsock may seek review of any state law claims in state court. The Clerk is directed to enter judgment in favor of defendants and close this case.

**SO ORDERED.**

Dated this 9th day of May, 2005, at Bridgeport, Connecticut.


/s/ Janet C. Hall
Janet C. Hall
United States District Judge